**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 4, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RAYMUNDO GUEVARA-LOPEZ,

    Defendant - Appellant.

No. 24-2045

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:23-CR-00917-MIS-1)**

---

Violet N. D. Edelman, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

Emil J. Kiehne, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

Raymundo Guevara-Lopez pleaded guilty to a single criminal count related to his bulk-cash smuggling for drug cartels based in Mexico. Despite a sentencing range of 24 to 30 months under the United States Sentencing

Guidelines, the district court varied upward to the statutory maximum of 60 months' imprisonment for Guevara-Lopez. Guevara-Lopez now appeals his sentence. He argues that the sentence imposed is substantively unreasonable. We agree and so, exercising our jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we vacate his sentence and remand for resentencing.

## BACKGROUND

### I.     Factual Background

In September 2021, a New Mexico State Police officer stopped nineteen-year-old Guevara-Lopez for a minor traffic violation. After pulling over, Guevara-Lopez stepped out of the vehicle while a passenger stayed inside. The officer separately asked Guevara-Lopez and the passenger about their travel plans, and they provided inconsistent responses. These inconsistencies raised the officer's suspicions and prompted his memory of having stopped Guevara-Lopez three months before. At that earlier traffic stop, Guevara-Lopez had also stumbled in describing his travel plans, but a voluntary vehicle search had yielded nothing illegal at the time.

After recalling the prior traffic stop, the officer asked Guevara-Lopez some more questions. Guevara-Lopez then consented to a search of his vehicle. During the search, the officer noticed screwed-in panels inside the vehicle and removed them. Behind the panels were three vacuum-sealed packages wrapped in silver cellophane. Two packages contained cash totaling $60,980. The third package had only a piece of cardboard in it. Because of this discovery, officers

2

detained Guevara-Lopez and the passenger. Guevara-Lopez claimed that the passenger was not involved, declined to cooperate with any investigation, and commended the officer on a "good job." R. vol. II, at 6.

But once transported to the Homeland Security Investigations office, Guevara-Lopez decided to confess. He admitted that he and the passenger had traveled to Colorado to pick up U.S. currency and transport that currency to Mexico. He knew that he needed to declare currency over $10,000 at the border but had planned to keep the money hidden. He also acknowledged that the currency had come from drug proceeds and reported that he would have received $2,000 for the trip. When asked about his earlier trips, Guevara-Lopez initially claimed that he had "lost count" but later estimated making 25 to 30 trips. *Id.* at 7. He reported that he was paid based on the amount of currency he transported and that he typically transported between $110,000 to $118,000 each trip. He explained that at these amounts, one trip would yield about a $5,000 payment. He relayed that an individual from Mexico offered him this job in March 2021. And a week after that offer, he had received a $3,000 down payment for his vehicle and a temporary tag to complete his first currency pick-up in Denver.

## II.    Procedural Background

### A.    The Indictment and Guilty Plea

In June 2023, a federal grand jury returned an indictment charging Guevara-Lopez with attempted bulk-cash smuggling and aiding and abetting, in

violation of 31 U.S.C. § 5332(a)(1), (b) and 18 U.S.C. § 2.[1] This offense carries a statutory maximum of sixty months' imprisonment. 31 U.S.C. § 5332(b)(1). A month later, Guevara-Lopez was arrested on the indictment and transferred to federal custody to face this charge.[2] He pleaded guilty without a plea agreement to the single criminal count.

## B.    The Presentence Report (PSR) and Sentencing Memoranda

In the PSR, the probation officer calculated a criminal-history category of I, a total offense level of 17, and an advisory guidelines range of 24 to 30 months. Guevara-Lopez's criminal-history calculation is straightforward. He has no adult criminal convictions, so zero criminal-history points and a corresponding criminal-history category of I. But relevant to this appeal, we note that Guevara-Lopez had pending criminal charges in Texas when he was arrested on the federal indictment. The state charges were as follows: In March 2023, he was charged with one count of possessing with intent to deliver tetrahydrocannabinols (four grams or more but under 400 grams) and nine counts of smuggling of persons under Texas law. Then in May 2023, he was charged with four counts of smuggling of persons for pecuniary benefit under

---

[1] The record does not reveal why the government waited nearly two years to charge Guevara-Lopez.

[2] At the time of his federal arrest, Guevara-Lopez was detained on pending state charges under Texas law.

4

Texas law. These Texas arrests occurred after the underlying events of this case.

For offense-level calculations, U.S.S.G. § 2S1.3(a)(2) provided the base offense level for Guevara-Lopez's conviction under 31 U.S.C. § 5332(a)(1), (b). That guideline calls for a base offense level of 6, plus 16 offense levels due to a monetary amount of more than $1.5 million.[3] U.S.S.G. § 2S1.3(a)(2) (with a cross-reference to U.S.S.G. § 2B1.1). He also received a 2-level enhancement under U.S.S.G. § 2S1.3(b)(1) for knowledge of the money's unlawful use, a 2-level reduction under U.S.S.G. § 3B1.2(b) for his minor role, a 3-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, and a 2-level reduction under U.S.S.G. § 4C1.1 for his offense conduct and having zero criminal-history points. These adjustments resulted in a total offense level of 17. Using a total offense level of 17 and a criminal-history category of I, the probation officer calculated a guidelines range of 24 to 30 months.

The PSR also included statistics from the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) platform. The statistics reveal that from 2018 to 2022, 70 defendants nationally were sentenced under a primary guideline of § 2S1.3 with a total offense level of 17 and a criminal-history

---

[3] The probation officer calculated the monetary amount by multiplying conservative estimates of 25 prior trips by $110,000 transported each trip.

category of I.[4] R. vol. II, at 16. For these defendants, courts ordered sentences of imprisonment averaging 13 months, which together had a median term of imprisonment of 12 months. *Id.* Excluding the 8 defendants who received no term of imprisonment, the average term of imprisonment was 15 months, and the median term of imprisonment was 16 months. *Id.*

After reviewing the PSR, the parties filed memoranda detailing their positions on sentencing. Guevara-Lopez requested a sentence of twelve months and one day, which matched the median sentence for defendants under the cited JSIN statistics. He also asked the district court to treat his sentence as starting on July 21, 2023, arguing that his federal custody began even for time he remained in the primary custody of Texas. The government requested a sentence within the guidelines range. Despite the JSIN statistics, the government argued that "very few defendants charged with Bulk Cash Smuggling[] are accountable for smuggling $2,750,000 in cash." R. vol. I, at 21. The government acknowledged that the large amount of money drives the high guidelines range in this case.

---

[4] The 70 defendants do not include defendants who received a downward departure under U.S.S.G. § 5K1.1 for substantial assistance. We recognize that not all convictions employing U.S.S.G. § 2S1.3 are for Guevara-Lopez's crime of conviction—that guideline section encompasses convictions under 18 U.S.C. §§ 1006, 1007, 1960 (but only for unlicensed money transmitting businesses as defined in 18 U.S.C. § 1960(b)(1)(A) and (B)); 26 U.S.C. §§ 7203 (if a violation based on 26 U.S.C. § 6050I), 7206 (if a violation based on 26 U.S.C. § 6050I); 31 U.S.C. §§ 5313, 5314, 5316, 5318, 5318A(b), 5322, 5324, 5326, 5331, 5332, 5335, 5336. U.S.S.G. § 2S1.3 (Statutory Provisions); U.S.S.G. App. A.

### C.    The Sentencing Hearing

On March 21, 2024, the district court held a sentencing hearing and announced that it was considering an upward variance. The government reiterated its request that the district court impose a sentence within the advisory-guidelines range. Defense counsel advocated for a sentence of twelve months and one day, citing Guevara-Lopez's lack of criminal history, the impact of the COVID-19 pandemic on his ability to find work, and his youth. Defense counsel also requested that Guevara-Lopez receive credit toward his federal sentence for time spent in the primary custody of Texas after his July 21, 2023 arrest on the federal indictment. The government stated that the district court did not have authority to "back-wind" the start of a sentence, and the court agreed that the potential solution, if needed, would be a downward variance. R. vol. IV, at 25.

After argument from counsel, Guevara-Lopez allocuted. He apologized for his actions and stated that he had been trying to support his mother. He answered the district court's questions and called his crimes "stupid." *Id.* at 26. Responding to the court's stated concerns, he explained that he had indeed thought about the harm that his crime caused in Mexico but had viewed his trips as just a job. He described how he had dropped out of high school to financially support his family but failed to find employment during the COVID-19 pandemic. He also stated, "[A]t this point, it's too late to regret what I did," and, "[I]t's done already." *Id.* at 29. He claimed that he "just wanted a better

life," agreeing with the district court that he "unfortunately" caused suffering for citizens of Mexico by assisting the cartels. *Id.* at 30. After defense counsel explained that Guevara-Lopez was not the "most well-spoken young man" but had worked on becoming a better person, Guevara-Lopez relayed that he had obtained his commercial driver's license and that his main priority was supporting his mother. *Id.* at 31.

The district court sentenced Guevara-Lopez to the statutory maximum of sixty months' imprisonment, followed by three years' supervised release. The court stated on the record that it had considered (1) the parties' arguments, including the government's requested within-guidelines-range sentence, (2) the crime's occurrence during COVID-19, (3) the average sentence for similar violators being 12 months, (4) Guevara-Lopez's youth, (5) his pending Texas state charges, (6) his mother's illnesses, and (7) his self-reflection while incarcerated. The court then highlighted a few factors under 18 U.S.C. § 3553(a):

*(1) Nature and Circumstances of the Offense, § 3553(a)(1):* The district court noted that Guevara-Lopez had smuggled $2.75 million in cash for cartels in Mexico. It cited the pending Texas charges and inaccurately described Guevara-Lopez as having committed his federal offense while on state bond.[5]

---

[5] The district court mistook his July 2023 arrest on the federal indictment for the September 2021 arrest at the traffic stop. The record reflects that Guevara-Lopez correctly described the sequence of events during his

*(footnote continued)*

8

Because the district court mistakenly believed he had been on state bond when he committed the federal offense, it considered the nature and circumstances of the offense "extremely egregious." *Id.* at 33.

*(2) History and Characteristics of the Defendant, § 3553(a)(1):* The district court acknowledged that Guevara-Lopez was young and did not have any criminal history. But it found that these circumstances failed to sufficiently mitigate the other § 3553(a) factors.

*(3) Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment, § 3553(a)(2)(A), and to Afford Adequate Deterrence, § 3553(a)(2)(B):* For this factor, the district court found that an upward variance was necessary. It highlighted the need for adequate deterrence given that Guevara-Lopez had smuggled large amounts of cash to Mexico about 25 to 30 times.

*(4) Need to Avoid Unwarranted Sentence Disparities, § 3553(a)(6):* The district court stated that Guevara-Lopez failed to show any unwarranted sentence disparity among defendants with similar records and similar conduct. And the district court reasoned that even if a sentence disparity existed, that disparity would be warranted by the facts here.

---

allocution, stating, "Well, I would just like to apologize for what I did. And my problem was two years ago. Yes, I picked up new charges in Texas." R. vol. IV, at 26.

The district court later produced a written "statement of reasons" for its upward variance. The district court checked the following boxes:

- General Aggravating or Mitigating Factors: The district court wrote, "Repeated action over extended period of time, the large amount of cash transported." R. vol. III, at 3 (under the nature and circumstances of the offense).

- Issues with Criminal History: The district court explained, "Committed instant offense while on bond for State of Texas cases." *Id.* (under the history and characteristics of the defendant).

- To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *Id.*

- To afford adequate deterrence to criminal conduct. *Id.*

- To protect the public from further crimes of the defendant. *Id.*

- To provide the defendant with needed educational or vocational training. *Id.*

- To avoid unwarranted sentencing disparities among defendants. *Id.*

The statement of reasons also contained an explanation for the upward variance. The district court acknowledged various mitigating factors, including his difficulty finding work during the COVID-19 pandemic, his youth at the offense, and his mother's illnesses. But it found that "these mitigating factors are severely outweighed by [his] repeated conduct, with over 25 trips to Mexico smuggling large amounts of cash." *Id.* at 4. The district court noted Guevara-Lopez's alarming lack of consideration toward the harm he caused in Mexico by transporting $2.75 million to drug cartels there. It also stated that Guevara-Lopez committed this offense while out on bond for two unrelated Texas cases. For these reasons, the district court determined that an upward variance was

10

appropriate and sentenced him to the statutory maximum of sixty months' imprisonment. Guevara-Lopez timely appealed his sentence.

## DISCUSSION

On appeal, Guevara-Lopez challenges the substantive reasonableness of his sixty-month sentence. He argues that the district court failed to justify the significant upward variance given the guidelines range of 24 to 30 months. He contends that the district court did not adequately consider (1) the nature and circumstances of the offense, § 3553(a)(1); (2) the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). We agree with Guevara-Lopez that the sentence imposed insufficiently accounts for the need to avoid unwarranted sentence disparities. The sentence also reflects incorrect information about Guevara-Lopez's Texas charges, which infected the district court's analysis of the nature and circumstances of the offense and the history and characteristics of the defendant. We start with the legal standard for reviewing the reasonableness of a sentence and then analyze why this particular sentence is substantively unreasonable.

## I.    Legal Standard

Courts must impose sentences that are "'sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just

punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). Section 3553(a) requires sentencing courts to consider seven factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). When imposing a sentence, the district court must "engage in a holistic inquiry of the § 3553(a) factors" while respecting the unique circumstances of each individual defendant. *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014) (citation modified); *see, e.g.*, *Gall v. United States*, 552 U.S. 38, 52 (2007).

"[W]e review sentences imposed by the district court for reasonableness." *United States v. Cookson*, 922 F.3d 1079, 1091 (10th Cir. 2019). A sentence must be both procedurally reasonable and substantively reasonable. *Id.* Procedural reasonableness looks at "whether the district court committed any error in calculating or explaining the sentence." *Id.* (quoting *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009)). Substantive reasonableness considers "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (quoting *Friedman*, 554 F.3d at 1307). Though relegated to separate categories, procedural reasonableness overlaps with substantive reasonableness "when a challenge is based on the district court's explanation of

the § 3553(a) factors." *United States v. Crosby*, 119 F.4th 1239, 1248 (10th Cir. 2024). The district court's explanation implicates both procedural and substantive reasonableness, because that explanation is a "procedural requirement" and is "relevant to whether the length of the sentence is substantively reasonable[.]" *Id.* (citation modified). A "cogent and reasonable explanation" for a sentence makes that sentence more likely "within the bounds of reasonable choice," while a "limited, brief, or inconsistent explanation can hinder our review of a sentence's substantive reasonableness." *Id.* (citation modified).

This case deals with substantive reasonableness. "We review a district court's sentencing decision for substantive reasonableness under an abuse-of-discretion standard, looking at the totality of the circumstances."[6] *Cookson*, 922 F.3d at 1090 (citation modified). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *Friedman*, 554 F.3d at 1307 (citation modified).

We apply this standard with "substantial deference to the district court." *United States v. Peña*, 963 F.3d 1016, 1024 (10th Cir. 2020) (citation modified). That deference derives from the district court's "superior position to find facts and judge their import under § 3553(a) in the individual case." *Cookson*, 922 F.3d at 1091 (quoting *Gall*, 552 U.S. at 51). We "do not apply a

---

[6] The parties agree that abuse of discretion is the correct standard of review.

13

presumption of unreasonableness to sentences outside the guidelines range." *Id.* at 1090.

But we also cannot "just provide a rubber stamp of approval to the lower court's sentence." *Peña*, 963 F.3d at 1024. In reviewing a district court's decision to impose an upward variance, we "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "A 'major' variance should have 'a more significant justification than a minor one.'" *Lente*, 759 F.3d at 1158 (quoting *Gall*, 552 U.S. at 50). And a "district court properly engages in this inquiry when it bases its decision on specific, articulable facts supporting the variance and does not employ an impermissible methodology or rely on facts that would make the decision out of bounds." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018).

We have recognized the need to "review a downward variance from the recommended guidelines range . . . [with] even more solicitude to the sentencing court," because the "downward variance is based simply on the district court's *discretionary authority* to consider the nature and circumstances of the offense and select a sentence sufficient, but not greater than necessary, to comply with all of the purposes of sentencing." *Id.* (citation modified). That same rationale applies to upward variances, and we employ equal attention given to downward variances to the upward variance in this case.

14

## II.    Analysis

Guevara-Lopez challenges the substantive reasonableness of his sentence on various grounds, including that the district court failed to consider unwarranted sentence disparities. In reviewing the district court's reasons for imposing a sixty-month sentence, we conclude that the district court insufficiently justified the significant upward variance. *See Crosby*, 119 F.4th at 1252–53 (vacating a sentence as substantively unreasonable due to the district court's insufficient explanation for imposing the sentence); *Cookson*, 922 F.3d at 1096 (same). Given the extent of the district court's upward variance—double the top end of the advisory-guidelines range and all the way up to the statutory maximum—we determine that the district court (1) failed to sufficiently address any unwarranted sentence disparities that may result from its sentence, and (2) relied on incorrect information about the Texas charges that rendered inadequate its explanation of the nature and circumstances of the offense and the history and characteristics of the defendant. Because of these errors, we hold that the sentence imposed is substantively unreasonable. We expound on our holding below.

### A.    Unwarranted Sentence Disparities

Section 3553(a)(6) requires a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" Guevara-Lopez argues on appeal that the sentence imposed creates unwarranted disparities. At sentencing,

15

defense counsel requested a sentence of twelve months and one day, citing JSIN statistics in the PSR. As described above, the JSIN statistics reveal that from 2018 to 2022, the average sentence for offenders like Guevara-Lopez (sentenced under § 2S1.3 with a total offense level 17 and criminal-history category I) was 13 months and the median sentence was 12 months. On appeal, Guevara-Lopez relies on the JSIN statistics from 2019 to 2023 as well. Those statistics reveal that no defendant received an upward departure or variance in that five-year period. JSIN, U.S. Sent. Comm'n, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited Feb. 24, 2025) (selecting primary guideline § 2S1.3, criminal-history category I, and total offense level 17). For defendants who were sentenced to imprisonment, 61% received a downward departure or variance, 22% received a guidelines-range sentence, and 17% received a downward departure for substantial assistance under U.S.S.G. § 5K1.1. *Id.* And of all defendants, 67% received a sentence below the guidelines range and 14% received a sentence of probation or a fine only. *Id.*

"This court has previously suggested that when a major variance is at play, the district court proclaims a substantively reasonable sentence when it considers 'comparative data regarding the degree of' a defendant's mens rea and 'a thorough survey of sentences entered by other federal courts for similar conduct.'" *Crosby*, 119 F.4th at 1251 (quoting *Lente*, 759 F.3d at 1175).

16

Despite the JSIN statistics suggesting a significant disparity, the district court cursorily addressed this factor. At sentencing, the district court stated:

> I'm considering the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conducted [sic].

> The defense hasn't made any showing that there's an unwarranted sentencing disparity among defendants with similar records who were found guilty of similar conduct. But if there is some sentencing disparity, I find it is warranted by the particular facts in this case.

R. vol. IV, at 34–35. The district court mentioned "that the average sentence in a case like this is 12 months" but otherwise never discussed the JSIN statistics. *Id.* at 32. In the statement of reasons for imposing its sentence, the district court checked a box reading, "To avoid unwarranted sentencing disparities among defendants." R. vol. III, at 3.

Given that Guevara-Lopez received a significant upward variance and is the *only* defendant to receive an upward variance of *any* degree from 2019 to 2023, we conclude that the district court insufficiently addressed unwarranted sentence disparities. The district court glossed over this sentencing factor despite the JSIN statistics showing that the sentence imposed is an outlier sentence. The significant upward variance demands a more detailed explanation of this factor to justify the variance imposed. *See Lente*, 759 F.3d at 1158. And "[w]ithout any explanation from the district court on the weight it afforded this critical factor in granting the defendant such a large variance, we consider the

17

sentence as substantively unreasonable." *Crosby*, 119 F.4th at 1251 (citation modified).

The government complains that the JSIN statistics do not reveal any of the underlying conduct that the other defendants engaged in and therefore make an insufficient comparator for analyzing sentence disparities. We have held that "bare national statistics do not shed light on the extent to which the sentences that the statistics pertain to involve defendants that are similarly situated to [the defendant here]." *United States v. Garcia*, 946 F.3d 1191, 1215 (10th Cir. 2020). Without placing nationwide statistics "in a meaningful context," the comparison is "unhelpful for determining the substantive reasonableness of [the] sentence for his unique crime." *Id.* (citation modified).

But the specificity of the statistics in this case distinguishes them from the statistics in *Garcia*. In *Garcia*, the defendant argued that his sentence was substantively unreasonable by citing statistics from the U.S. Sentencing Commission for all offenders with a primary offense of "Firearms" in the Tenth Circuit and nationwide. Op. Br. at 22, *United States v. Garcia*, No. 18-6033 (10th Cir. May 29, 2018), ECF No. 28. Those statistics failed to account for criminal-history category, total offense level, or primary guideline and instead included all firearms offenses into a single category. *See* Statistical Info. Packet for the Tenth Circuit (Fiscal Year 2017) at 10, U.S. Sent. Comm'n, https://www.ussc.gov/research/data-reports/geography/2017-federal-sentencing-statistics (last visited Feb. 6, 2025); Sourcebooks of Federal

Sentencing Statistics (Table 32, 2017), U.S. Sent. Comm'n,

https://www.ussc.gov/research/sourcebook/archive/sourcebook-2017 (last

visited Feb. 6, 2025). That wide range of defendants provided no helpful

comparator for us to assess any sentence disparities.

Unlike the statistics in *Garcia*, the JSIN statistics referenced in this

appeal sufficiently narrowed the comparator-defendants so that a district court

would assist our review by meaningfully commenting on the unwarranted

sentence-disparities factor before imposing such a large variance as here. The

comparator-defendants share a total offense level, criminal-history category,

and primary guideline; the statistics reveal that no defendant with these

characteristics received an upward variance or departure since at least 2019;

and the district court imposed a sentence that is five times the average sentence

and double the highest guidelines sentence.[7] *See United States v. Perez-*

---

[7] Though Guevara-Lopez cites JSIN statistics on upward variances from years 2019 to 2023, we note that the JSIN statistics from 2018 to 2022 show the same information: No defendant with a total offense level of 17, criminal-history category I, and primary guideline of § 2S1.3 received an upward variance. *See* JSIN, U.S. Sent. Comm'n, https://jsin.ussc.gov/analytics/saw.dll? Dashboard (last visited Feb. 24, 2025) (based on requested 2018-to-2022 data from the Sentencing Commission).

We acknowledge that at the sentencing hearing, neither party provided JSIN statistics on the percentage of upward variances to the district court. But that does not preclude us from taking judicial notice of these publicly available (and readily accessible) statistics when reviewing the substantive reasonableness of a sentence on appeal. *See Stone v. High Mountain Mining Co.*, 89 F.4th 1246, 1261 n.7 (10th Cir. 2024) (taking judicial notice of statistics from the Bureau of Land Management); *United States v. White*, 620 F.3d 401, 416 (4th Cir. 2010) (taking judicial notice of the median and mean

(*footnote continued*)

*Rodriguez*, 960 F.3d 748, 756–57 (6th Cir. 2020) (explaining that sentencing statistics from the Sentencing Commission "should serve as a starting point for district judges to avoid unwarranted sentence disparities" (citation modified)). That not a single defendant received an upward variance of any degree, let alone an upward variance to the statutory maximum, raises significant concern of an unwarranted sentence disparity. *See Crosby*, 119 F.4th at 1251 (noting that the defendant failed to identify any case where a comparably situated defendant received a downward variance to a time-served sentence for possession of child pornography under this factor); *United States v. Walker*, 844 F.3d 1253, 1258 (10th Cir. 2017) (same for a 33-day sentence for bank robbery); *see also United States v. Boucher*, 937 F.3d 702, 713–14 (6th Cir. 2019) (concluding as part of reviewing substantive reasonableness that the district court should have more carefully addressed unwarranted sentence

---

sentences imposed for the defendant's charged crimes on a local and national level). As described below, *infra* note 12, a defendant need not preserve specific arguments or issues to challenge a sentence as substantively unreasonable on appeal. *See United States v. Bridgewater*, 950 F.3d 928, 933–35 (7th Cir. 2020). To hold otherwise would place an undue burden on the defendant to predict the district court's sentence and its explanation for the imposed sentence. *Id.* The circumstances here reflect the difficulty of that task. Neither party requested a sentence of 60 months. Guevara-Lopez asked for a 12-month sentence, the government requested a sentence within the guidelines range of 24 to 30 months, and the probation officer recommended a sentence within the guidelines range as well. The district court gave no indication that it was considering an upward variance until the sentencing hearing. So before that hearing, Guevara-Lopez reasonably did not expect the JSIN statistics on upward variances to affect the district court's sentencing decision. We therefore consider the JSIN statistics to aid our review of substantive reasonableness.

disparities in part because national statistics showed that the median and average terms of imprisonment for defendants with the same criminal-history category and conviction far exceeded the sentence imposed by the district court). Given the statistics and the significant upward variance, the district court failed to adequately address the unwarranted sentence-disparities factor.[8]

We acknowledge the tension in our case law regarding the role of statistical disparities at sentencing. *See United States v. Cortez*, 139 F.4th 1146, 1157 (10th Cir. 2025) (McHugh, J., concurring). On the one hand, *Garcia* instructs that "bare national statistics do not shed light on the extent to which the sentences that the statistics pertain to involve defendants that are similarly situated to [the defendant here]." 946 F.3d at 1215. Yet on the other hand, we have recognized that § 3553(a)(6) "requires a district court to take into account only disparities nationwide among defendants with similar records and Guideline calculations." *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010) (citation modified). And as discussed above, we have acknowledged that a district court's consideration of "comparative data" can contribute to the

---

[8] We also note that Guevara-Lopez is one of the few defendants to have ever received both a minor-role adjustment under U.S.S.G. § 3B1.2(b) and a sentence at the statutory maximum. In 2023, of the 64,124 defendants sentenced, only five defendants received both a minor-role adjustment and a statutory-maximum sentence. These low numbers hold for prior years as well—two defendants in 2022, three defendants in 2021, and four defendants in 2020. *See* JSIN, U.S. Sent. Comm'n, https://jsin.ussc.gov/analytics/saw.dll? Dashboard (last visited Mar. 6, 2025) (based on requested data from the Sentencing Commission).

substantive reasonableness of the imposed sentence. *Lente*, 759 F.3d at 1175. We address this apparent tension and provide further guidance on the role of statistics in our substantive-reasonableness review.

Though we distinguish *Garcia* from this case based on the specificity of the JSIN statistics, we note that other cases since oral argument have extended *Garcia*'s dictate on "bare national statistics" to the JSIN statistics. *See, e.g.*, *Cortez*, 139 F.4th at 1156 (majority opinion); *United States v. Valdez*, 128 F.4th 1314, 1318–19 (10th Cir. 2025). But in those cases, the district court adequately explained its reasons for the sentence imposed. Where the district court gives an otherwise sufficient explanation for the imposed sentence, "bare national statistics" without specific comparators cannot defeat the sufficiency of the district court's explanation. *See United States v. Kelley*, 359 F.3d 1302, 1305 (10th Cir. 2004) ("[W]e have made it quite clear that the sentencing court is not required to consider individually each factor listed in § 3553(a) before issuing a sentence."); *United States v. Penn*, 601 F.3d 1007, 1011 (10th Cir. 2010) (disclaiming any "require[d] ritualistic incantations of magic words" for the district court to fulfill its obligations under the § 3553(a) factors (citation modified)). But where, as here, the district court provides an otherwise inadequate explanation for the imposed sentence, the JSIN statistics can heighten our concerns if they suggest the existence of a significant disparity.

The government invites us to treat the JSIN statistics as if they have no place in our review for substantive reasonableness. That misses the mark. "The

JSIN data came from a reliable source designed specifically for judges to use during sentencing to fulfill their obligations under § 3553(a)(6)." *United States v. Brewster*, 116 F.4th 1051, 1062 (9th Cir. 2024). We reject the notion that the JSIN data has no value merely because the Sentencing Commission could have chosen more specific parameters for its publicly available data. *See id.* at 1060 ("Because JSIN data is highly relevant in sentencing, it would be inconsistent with § 3553(a)(6) for us to conclude that sentencing courts may not consider JSIN data, assuming such data is sufficiently reliable."). Instead, we must place this data in the context of the district court's overall explanation for the sentence, as well as in the context of the information available to us. For example, in comparing Guevara-Lopez's characteristics against the JSIN statistics, we find it alarming (1) that since at least 2018, no other defendant with the same criminal-history category, total offense level, and primary guideline has received an upward variance; (2) that even among this class of defendants with a criminal-history category I, Guevara-Lopez has no prior convictions and therefore has the lowest possible criminal history; and (3) that in 2023, only 5 of 64,124 defendants received both a minor-role adjustment and a sentence at the statutory maximum. Without an otherwise sufficient explanation to justify the extent of the upward variance, these statistics highlight the potential sentence disparities that the district court failed to guard against.

We also clarify that we do not require district courts to consult

Sentencing Commission data before imposing a sentence, nor do we require

district courts to follow national statistics when imposing a sentence. *See*

*Valdez*, 128 F.4th at 1316, 1318–19 (affirming the district court's upward

variance despite the JSIN statistics supporting that the imposed 24-month

sentence is an outlier).[9] But when the district court imposes a significant

---

[9] In *Valdez*, we affirmed a sentence of 24 months as substantively reasonable despite a guidelines range of 4 to 10 months. 128 F.4th at 1315–16. On appeal, the defendant had argued that the district court inadequately explained its sentence and created a risk of unwarranted sentence disparities. He cited JSIN statistics showing that, for defendants with the same primary guideline, total offense level, and criminal-history category, courts had imposed sentences averaging 4 months. In *Valdez*, we found the same district court's explanation sufficient to address any concerns that the JSIN statistics may have raised. But important differences between *Valdez* and this case prevent us from reaching the same conclusion here.

First, Guevara-Lopez was sentenced at the statutory maximum, meaning his offense conduct should reflect the worst conduct that Congress sought to punish under § 5332. Considering all the circumstances, we find that the district court's explanation so far does not persuade us that the 60-month sentence fits within the bounds of permissible choice. By contrast, the defendant in *Valdez* faced a statutory maximum of 10 years—far beyond the 24-month sentence he received.

Second, the magnitude of the upward variance in this case (30 months above the top end of the guidelines range) is greater than the upward variance in *Valdez* (14 months above the top end of the guidelines range). So an explanation that suffices for the 14-month variance in *Valdez* does not necessarily suffice for the 30-month variance here. *See Lente*, 759 F.3d at 1158.

Last, as we explain later, the district court here relied on incorrect facts to explain the extent of the variance. The court mistakenly believed that Guevara-Lopez committed his federal offense while on bond for his state charges and considered that fact "extremely egregious." R. vol. IV, at 33. That error, combined with the cursory explanation for the sentence-disparities factor, rendered the sentence substantively unreasonable. The district court made no

(*footnote continued*)

upward variance, it must still provide an explanation that justifies the extent of that variance. *See Lente*, 759 F.3d at 1158; *United States v. Lucero*, 130 F.4th 877, 890 (10th Cir. 2025) (McHugh, J., concurring) ("[W]hile the JSIN data do not dictate a particular decision, in my view, they are relevant to [the sentence-disparities] factor.").[10] And when the statistics reveal that not one case in the

---

comparable error in *Valdez*. For these reasons, *Valdez* differs from the present case.

[10] In *Lucero*, another appeal like *Valdez* and the present appeal being from the same district court, we affirmed a sentence of 120 months as procedurally and substantively reasonable despite a guidelines range of 57 to 71 months. 130 F.4th at 881–83. For substantive reasonableness, the defendant argued on appeal that the district court failed to adequately explain the sentence. *Id.* at 886. He cited JSIN statistics showing that, for defendants with the same primary guideline, total offense level, and criminal-history category, courts had imposed sentences averaging 55 months. *Id.* at 887. Despite the JSIN statistics, we concluded that the district court's explanation sufficed. *Id.* at 887–88. But *Lucero* does not control the outcome of this case for two reasons.

First, in *Lucero*, the defendant had a criminal-history category of IV. *Id.* at 883, 887. Though other defendants in the JSIN statistics had the same criminal-history category, a wide range of criminal conduct could support criminal-history category IV. A defendant with a consistent history of violent crime, such as the defendant in *Lucero*, is not comparable to a defendant with nonviolent convictions from over a decade ago. Without more information, the wide range of conduct captured by criminal-history category IV makes the JSIN statistics insufficient to show any sentence disparities in *Lucero*. Indeed, the district court acknowledged this by stating that any sentence disparity was warranted by the defendant's "long criminal history . . . [and] prior criminal conduct." *Id.* at 887 (quoting App. vol. III, at 120); *but see id.* at 890–91 (McHugh, J., concurring) (concluding that the district court's explanation for the sentence-disparities factor, which did not even acknowledge the JSIN statistics, was insufficient but agreeing with the majority that the sentence should be upheld). We do not face that problem here. Guevara-Lopez has zero criminal convictions. So even within the wide range of conduct that criminal-history category I might capture, we know that Guevara-Lopez has the lightest

(*footnote continued*)

last five years resulted in an upward variance, that fact "weigh[s] against a conclusion that [the sentence-disparities] factor supports his sentence." *Crosby*, 119 F.4th at 1251. For these reasons, we conclude that the district court failed to adequately explain this factor.

## B.    Texas-Charges Error

The lack of explanation for the sentence-disparities factor is compounded by the district court's misplaced reliance on the pending Texas charges to justify its upward variance. As aggravating factors, the district court listed (1) the 25 to 30 trips to smuggle a total of $2.75 million, (2) the connection to drug cartels in Mexico, (3) the pending charges in Texas, and (4) Guevara-Lopez's "alarming" lack of consideration toward the harm to Mexico. R. vol. III, at 3–4; *see* R. vol. IV, at 32–35. But the district court erred by stating, as a reason for the upward variance, that Guevara-Lopez "[c]ommitted [the] instant offense while on bond for State of Texas cases." R. vol. III, at 3; *see id.* at 4. In fact, Guevara-Lopez's initial traffic stop occurred in September 2021, followed by a nearly two-year unexplained gap in federal prosecution. He was not charged with the Texas offenses until 2023, which means he was not on state

---

conviction record possible. Without additional explanation, the district court failed to adequately consider the sentence-disparities factor.

Second, like in *Valdez*, the district court in *Lucero* did not rely on any erroneous fact to justify the significant upward variance. But here, the district court mistakenly believed that Guevara-Lopez committed his federal offense while on bond for state charges. These circumstances distinguish *Lucero* from the present case.

bond while committing his federal offense.[11] In many cases, this error may not have disturbed the overall reasonableness of the sentence imposed. But where we have a significant upward variance, supported by only a few facts, the inaccuracy of even one fact may tip the scale, rendering the justification for that variance unreasonable. *See Lente*, 759 F.3d at 1158 (requiring a more significant justification for a major upward variance); *Barnes*, 890 F.3d at 916 (requiring that "specific, articulable facts" support an upward variance).

That is the case here. Because the district court relied on only four factual predicates to support its substantial upward variance, an incorrect fact determination materially impedes our review of the sentence's substantive reasonableness. The factual inaccuracy infected the district court's discussion of the first § 3553(a) factor. R. vol. III, at 3; R. vol. IV, at 33. During sentencing, the district court found "the nature and circumstances of the offense to be extremely egregious," in part because Guevara-Lopez "had two pending cases in Texas when he committed this crime[.]" R. vol. IV, at 33. The court repeated its view that Guevara-Lopez had "[c]ommitted [the] instant offense while on bond for State of Texas cases" in its analysis of the defendant's history and characteristics. R. vol. III, at 3. The district court's mistake on the

---

[11] The PSR included the correct sequence of arrests. But the government's sentencing memorandum inaccurately claimed that Guevara-Lopez had two pending cases when he committed the federal offense. Neither party corrected that error at sentencing, and the district court relied on an inaccurate chronology when imposing its sentence.

timing of the pending Texas cases raises concerns about its explanation of the first § 3553(a) factor.

The insufficient justification for the significant upward variance becomes even more apparent when we consider the mitigating factors present here. As the district court recognized, the following factors mitigate Guevara-Lopez's conduct: his youth at his offense, his lack of criminal history, his mother's illnesses, and his difficulty finding work during the COVID-19 pandemic. We also note that Guevara-Lopez voluntarily told agents about his other trips to Mexico. He provided information about the amounts of money smuggled each trip and the payments he received. That admission caused the 16-level increase in his total offense level through the monetary amount under U.S.S.G. § 2B1.1. And though the number of trips and amount of money transported are certainly aggravating, these facts cut the other way as well. The high number of trips reflects a smaller amount of money transported each trip and might indicate that Guevara-Lopez occupied a relatively lower-level position in the underlying drug scheme than a defendant caught smuggling that same entire amount in a single traffic stop.[12] In evaluating the substantive reasonableness of the sentence, we need some clarification from the district court about how its

---

[12] The district court's awarding Guevara-Lopez a minor-role adjustment as the PSR recommended comports with this view too.

sentence is justified by the nature and circumstances of the offense, as well as

by the history and characteristics of the defendant.[13] *See* § 3553(a)(1).

---

[13] The government argues that Guevara-Lopez waived his objection to the district court's error on the Texas charges by failing to preserve this issue in the district court, by failing to raise it in his opening brief, and by failing to argue for plain-error review. But even under these circumstances, we exercise our discretion to consider the district court's error for several reasons.

First, our review of substantive reasonableness requires us to look at "all the circumstances of the case." *Cookson*, 922 F.3d at 1091 (citation modified). We cannot determine the substantive reasonableness of a sentence by merely reviewing certain sentencing factors in isolation of all other circumstances or by ignoring facts readily seen in the record. *See United States v. Peppel*, 707 F.3d 627, 634 (6th Cir. 2013) ("[T]his failure to raise one argument at sentencing—the need to avoid national sentencing disparities—does not transform the comprehensive substantive-reasonableness challenge into a new argument relegated to plain-error review.").

Second, though Guevara-Lopez fails to raise the district court's error in his opening brief, we exercise our discretion to consider this error. *See United States v. Leffler*, 942 F.3d 1192, 1198 (10th Cir. 2019); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992) ("[W]e may depart from the general waiver rule in our discretion, particularly . . . when manifest injustice would otherwise result."); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 905 F.2d 840, 854 (5th Cir. 1990) (recognizing that issues unaddressed in the opening brief are typically waived but exercising discretion to consider some of the new issues anyway). Here, both parties acknowledge the district court's error in their briefs, and the record shows the error. *See* R. vol. II, at 5, 9–10. This error does not involve any new argument but represents a corrected fact that aids our review of the substantive reasonableness of the imposed sentence. We therefore exercise our discretion to consider this issue. *See United States v. Myers*, 772 F.3d 213, 219 (5th Cir. 2014) (exercising discretion to consider an argument raised for the first time in a defendant's untimely filed reply brief in part because the error caused a significant disparity between the sentence imposed and the sentence the defendant otherwise would have received).

Third, our consideration of this error does not run afoul of the party-presentation principle. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Guevara-Lopez has consistently argued that the district court

(*footnote continued*)

### C.    Totality of the Circumstances

Turning to the district court's overall discussion of the § 3553(a) factors, the district court elaborated on five of the seven factors at sentencing:

- the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1);

- the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B);

- the kinds of sentences available, § 3553(a)(3);

- the kinds of sentence and the sentencing range established, § 3553(a)(4); and

---

imposed a substantively unreasonable sentence and even raised the pending Texas charges as insufficient to justify the extent of the upward variance. Under these circumstances, our consideration of the district court's error on the timing of the Texas charges does not violate the party-presentation principle.

Finally, the government contends that Guevara-Lopez waived this argument by failing to object to the district court's error at sentencing and by failing to argue for plain-error review in his opening brief on appeal. We disagree. We have held that a defendant fails to preserve a substantive-reasonableness argument only when he offers no argument for a lower sentence before the district court. *United States v. Mancera-Perez*, 505 F.3d 1054, 1058 (10th Cir. 2007). But so long as the defendant did not invite the error in the district court, we do not require a defendant to object at sentencing to preserve a claim that the sentence length is substantively unreasonable. *United States v. Torres-Duenas*, 461 F.3d 1178, 1182–83 (10th Cir. 2006). A defendant need not preserve specific arguments or issues on the substantive reasonableness of the imposed sentence to raise them on appeal. *See Bridgewater*, 950 F.3d at 933–35 (stating that a defendant does not need to make a sentence-disparities argument at sentencing to preserve that argument on appeal for a substantive-reasonableness challenge, because doing so would require the defendant to predict the district court's sentence, legal conclusions, and justifications). We may therefore consider the district court's error when reviewing the imposed sentence for substantive reasonableness under an abuse-of-discretion standard. And though we reach our conclusions independent of this fact, we note that Guevara-Lopez correctly described the chronology of his state and federal charges during his allocution.

30

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

As discussed, the district court primarily focused on the first two factors listed to justify the upward variance. § 3553(a)(1), (2)(B). Because we concluded that the district court failed to adequately address § 3553(a)(1), (6), the court addressed only § 3553(a)(2)(B), (3)–(4) without error. And only the district court's explanation under § 3553(a)(2)(B)—adequate deterrence—included aggravating factors that support an upward variance. *Cookson*, 922 F.3d at 1092–96 (vacating as substantively unreasonable a 5-year sentence of probation for a defendant convicted of child pornography, because the district court primarily relied on just one sentencing factor, § 3553(a)(1), to explain a significant downward variance).

Reviewing "all the circumstances of the case," we conclude that the sentence imposed is substantively unreasonable. *Id.* at 1091 (citation modified). The district court failed to adequately consider unwarranted sentence disparities, the nature and circumstances of the offense, and the history and characteristics of the defendant. Its remaining explanation under three of the seven sentencing factors—of which only one factor included aggravating circumstances—is not enough to justify the significant upward variance imposed in this case.

For these reasons, we hold that the district court abused its discretion by imposing a substantively unreasonable sentence. *See Walker*, 844 F.3d at 1259

31

(vacating as substantively unreasonable a 33-day time-served sentence for a defendant convicted of bank robbery, because the district court inadequately considered punishment, general deterrence, incapacitation, respect for the law, and the need to avoid unwarranted sentence disparities); *Crosby*, 119 F.4th at 1249–52 (same for a 5-day time-served sentence for a defendant convicted of child-pornography, because the district court inadequately considered retribution, general deterrence, the need to avoid unwarranted sentence disparities, and policy disagreements with the guidelines enhancements for child-pornography offenses); *United States v. Allen*, 488 F.3d 1244, 1262 (10th Cir. 2007) (same for a 360-month sentence, because the district court relied on a guidelines range for uncharged conduct, unrelated to the offense of conviction, to impose an extreme upward variance). Our holding does not preclude the possibility that a sixty-month sentence is substantively reasonable under a more robust discussion of the § 3553(a) factors to justify the major upward variance.[14] *See Cookson*, 922 F.3d at 1092 ("A sentence deemed

---

[14] Guevara-Lopez raises other arguments that we find unavailing. First, he contends that the district court abused its discretion by justifying the upward variance based on aggravating factors already accounted for in the calculated guidelines range. We disagree. "[D]istrict courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory guidelines range." *United States v. Walker*, 74 F.4th 1163, 1205 (10th Cir. 2023) (citation modified). The district court did not err on this basis. Second, Guevara-Lopez argues that the district court should have credited his eight months of imprisonment in the primary custody of Texas. But as the government correctly points out, he cites no authority requiring the district court to account for this

(*footnote continued*)

substantively unreasonable primarily because of an explanation too brief or cursory to justify the extent of its variance from the Guidelines might be substantively reasonable given a more detailed explanation.").

### D.    The Dissent

We pause here to address a few points from the dissent. First, the dissent frames our holding as "requir[ing] extraordinary circumstances to justify a sentence outside the Guidelines range, unless some minimum percentage of defendants with the same guideline range under the same guideline have received comparable sentences." Dissent at 9 (citation modified). But at no point do we require any sort of threshold for the percentage of similarly situated defendants with comparable sentences. The dissent misunderstands the basis for our holding. We hold that the sentence is substantively unreasonable because the district court inadequately explained the significant upward variance imposed, not because of statistical disparities. At most, we use the statistics to show that not a single case resulted in the same sentence. *See Crosby*, 119 F.4th at 1251 (noting that the defendant "fail[ed] to identify any other case where a comparably situated defendant received a time-served sentence for possession of child pornography, weighing against a conclusion

---

time. Moreover, 18 U.S.C. § 3585(b) addresses any concern that Guevara-Lopez won't receive credit for his eight months in state prison. 18 U.S.C. § 3585(b) (providing that a defendant will receive credit for any period of imprisonment resulting from another charge received after the instant offense that has not been credited against another sentence).

that this factor supports his sentence"). The statistical disparities that we highlight merely demonstrate our concern with the significant upward variance given the inadequate explanation. And we also leave open the possibility that a sixty-month sentence can be substantively reasonable with a more detailed explanation for the sentence.

The dissent portrays our citations to these statistics as creating "a presumption of unreasonableness, which would not be consistent with *United States v. Booker*, 543 U.S. 220 (2005)." Dissent at 10 (citation modified). We fail to see how the opinion approaches this sort of sentencing regime, given that we disclaim any requirement for the district court to consult sentencing data before imposing a sentence. *See supra* Discussion II.A. Again, the dissent mistakenly attributes the cause of our holding to statistical disparities, rather than to the inadequate explanation. The dissent's position amounts to a mandate for us to turn a blind eye toward the JSIN statistics, even though they were compiled "at the request of judges to provide quick online access to sentencing data for similarly situated individuals." *Cortez*, 139 F.4th at 1157 (McHugh, J., concurring) (citation modified) (describing the JSIN database). Though true that our case law treats "bare national statistics" as unhelpful to "shed light" on identifying similarly situated defendants, *Garcia*, 946 F.3d at 1215, that does not mean we are barred from all consideration of these statistics when reviewing for a sentence's substantive reasonableness. And where, as here, the district court's explanation for an upward variance of this magnitude is lacking,

34

the cited statistics can reinforce our concerns about the insufficient nature of the court's explanation. *See Lente*, 759 F.3d at 1158. In our substantive-reasonableness review, we decline to dismiss every use of statistics with a rote citation to *Garcia* or to serve as a "rubber stamp" for sentencing courts to impose any sentence within the statutory maximum. *Peña*, 963 F.3d at 1024.

Second, the dissent compares this case, which involves a conviction under 31 U.S.C. § 5332, to cases in which defendants were convicted under 18 U.S.C. § 1956. Dissent at 11–16. The dissent claims that the defendant's conduct could have resulted in a charge under § 1956 and calculates a guidelines range of 70 to 87 months based on that hypothetical conviction. *Id.* at 11–14 (noting that a conviction under § 1956 carries a maximum sentence of 20 years). But we have deemed this type of analysis substantively unreasonable. *See Allen*, 488 F.3d at 1251–52, 1259–62 (vacating a sentence as substantively unreasonable where the district court imposed a sentence based on a recalculated guidelines range for the defendant's uncharged conduct); *cf. United States v. Wolfe*, 435 F.3d 1289, 1294, 1303–05 (10th Cir. 2006) (vacating a sentence as unreasonable where the district court imposed an upward departure by sentencing a defendant convicted of involuntary manslaughter using a recalculated guidelines range for second-degree murder with malice aforethought). A court cannot disregard the guidelines range and instead sentence based on the guidelines range for a different hypothetical

35

conviction. *See Allen*, 488 F.3d at 1259–62 (citing *Wolfe*, 435 F.3d at 1304 n.12).

The dissent appears to acknowledge this principle and correctly notes that the district court never substituted the guidelines calculation for one under another hypothetical conviction. So we fail to see why a substantively unreasonable mode of analysis for the district court at sentencing would transform on appeal into a permissible explanation for the sentence's substantive reasonableness. *See United States v. Graham*, 123 F.4th 1197, 1293 (11th Cir. 2024) ("[D]efendants convicted of different offenses, or subject to different advisory guideline ranges, are not 'similarly situated' for the purpose of considering sentencing disparities."). More generally, we disagree with the dissent's reasoning, which relies on speculation that Guevara-Lopez was undercharged, that he would have been convicted under § 1956, and that he would have received the same sentence for this other conviction. Maybe Guevara-Lopez was undercharged, maybe not. The district court never elicited information on this subject, so we have little in the record to assess this issue. And we cannot endorse speculation about "potential" convictions, which runs into Sixth Amendment concerns, as a consideration for sentencing. The

36

dissent's post-hoc guesswork—unmoored from the district court's stated reasons—cannot save the district court's inadequate explanation on appeal.[15]

Third, the dissent claims that the district court's reliance on a factual error should fall under a review for procedural reasonableness, rather than substantive reasonableness. We acknowledge that the Supreme Court treats a sentencing explanation that relies on "clearly erroneous facts" as a "procedural error." Dissent at 20 (quoting *Gall*, 552 U.S. at 51). But our cases have also recognized that "the district court's explanation for a given sentence serves a dual purpose"—as "a procedural requirement" and to facilitate a "meaningful appellate review of a sentence's substantive reasonableness." *Cookson*, 922 F.3d at 1091 (citation modified). And a district court's reliance on clearly erroneous facts contributes to the inadequacy of the district court's explanation, such that they may sufficiently impede our review for substantive reasonableness. That is the case here.

The dissent also comments on how we "infer[] that the [factual] error must have influenced the sentence" and claims that "[t]his analysis is flawed." Dissent at 21. But our conclusion is no mere inference. In the written statement of reasons, the district court listed the factual error as part of "the basis for a

---

[15] The dissent also attempts to justify the sentence's reasonableness by treating the district court's ruling on the minor-role adjustment as superfluous. Again, we disagree with how the dissent ignores important aspects of Guevara-Lopez's conviction and sentencing when comparing his sentence to the sentences of supposedly similar defendants. We find the dissent's disregard for the minor-role adjustment equally unavailing.

variance." R. vol. III, at 3–4. Had the district court recognized the correct sequence of arrests, perhaps it would have viewed the later human-smuggling arrests as an escalation in Guevara-Lopez's criminal behavior. Or perhaps the district court, upon further questioning, would have viewed the later arrests as inconsequential. We don't know, and that's the problem. While this error may not affect most cases, it does so here because of the inadequate explanation overall. We view this error in tandem with the few aggravating facts cited by the district court, as well as the district court's reliance on a single sentencing factor (without error) to explain the upward variance. *See Cookson*, 922 F.3d at 1092–96. Under these circumstances, we conclude that the district court failed to adequately explain its decision to vary up to the statutory maximum. *See Gall*, 552 U.S. at 47 ("In reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines.").

Though *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Booker* may have led to greater variation in sentences, they did not create a blank check for a sentencing court to impose any sentence within the statutory maximum. A sentence within a properly calculated guidelines range still carries "a presumption of reasonableness," *United States v. Ware*, 93 F.4th 1175, 1180 (10th Cir. 2024) (citation modified), and a "major variance should have a more significant justification than a minor one," *Lente*, 759 F.3d at 1158 (citation modified). In our view, the dissent unduly minimizes our role in reviewing the

imposed sentences for substantive reasonableness. And importantly, we must guard against a defendant's sentence being perceived—whether fairly or unfairly—as merely dependent on which judge he or she receives.[16]

## CONCLUSION

For these reasons, we hold that Guevara-Lopez's sentence is substantively unreasonable. We vacate the district court's decision sentencing Guevara-Lopez to sixty months' imprisonment and remand for resentencing.

---

[16] *See, e.g.*, *Valdez*, 128 F.4th at 1315, 1317 (10th Cir. 2025) (substantive-reasonableness appeal for a defendant sentenced to 24 months' imprisonment despite guidelines range of 4 to 10 months); *Lucero*, 130 F.4th at 881–83 (10th Cir. 2025) (procedural- and substantive-reasonableness appeal for a defendant sentenced to the statutory maximum of 120 months despite guidelines range of 57 to 71 months); *Cortez*, 139 F.4th at 1149 (10th Cir. 2025) (procedural- and substantive-reasonableness appeal for a defendant sentenced to 60 months' imprisonment despite guidelines range of 21 to 27 months); *United States v. Chee*, No. 24-2053, 2025 WL 573768, at *1 (10th Cir. Feb. 21, 2025) (procedural- and substantive-reasonableness appeal for a defendant sentenced to 108 months' imprisonment despite guidelines range of 30 to 37 months).

24-2045, *United States v. Guevara-Lopez*
**HARTZ**, J. dissenting

## I.

Defendant Raymundo Guevara-Lopez had a good-paying job with a Mexican drug cartel. Over the course of six months he earned more than $125,000 on 25 to 30 trips transporting close to $3 million in proceeds from U.S. drug sales across the border into Mexico. He did so knowing the violence and other harm caused by the cartel. Although in his prepared allocution remarks he said that his motive was to help his mother financially, he admitted when questioned by the district court that he took the work to have a better life for himself. Despite knowing the harm he had caused, he told the court that it was done already and it was too late to have regrets.

The panel majority thinks it was substantively unreasonable to sentence Defendant to five years' imprisonment. I respectfully dissent. The principal basis for the majority's criticism of the sentence is that it substantially exceeded sentences for defendants with the same criminal-history category and the same offense level calculated under the applicable guideline. But the proper test would have been to compare Defendant with similar persons committing like offenses. And the universe of like offenses should at least include transportation money laundering, under which a five-year sentence would have been well within, and probably below, his guideline range (in other words, the prosecution undercharged him).

The panel majority opinion also finds fault with procedural aspects of Defendant's sentencing. It says that the district court failed to explain why his sentence exceeded the

average sentence of those with the same criminal history and the same offense level under the applicable guideline. And it points out a factual error made by the district court. But the alleged failure-to-explain error is predicated on an analysis that is fraught with potential pitfalls. And the factual error was not preserved below—likely overlooked because it was of minimal, if any, significance; indeed, correction of the error might have placed Defendant in an even worse light.

II.

The issue before this court turns on common sense, not legal technicalities. In determining whether a sentence is substantively unreasonable, we consider "whether the sentence fell within the range of rationally available choices," *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) (internal quotation marks omitted), or instead "exceeded the bounds of permissible choice," *United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018) (internal quotation marks omitted). I therefore begin by summarizing the relevant evidence and the district court's explanation for the sentence. The reader should then be able to judge whether the sentence satisfied the "substantive reasonableness" test of the United States Supreme Court. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Defendant was arrested after a traffic stop in September 2021 when New Mexico State Police officers found $60,980 hidden behind panels in his vehicle. He was 19 and had no adult criminal record. He confessed that he had picked up the money in Colorado and was taking it to Mexico. He said that over the course of six months he had "earned" more than $125,000 by helping a Mexican drug cartel collect at least $2.75 million in proceeds from drug sales in this country. Between March and September 2021, he had

2

made 25 to 30 trips from Denver, Colorado, and other U.S. locations to Ciudad Juarez, Mexico, usually smuggling $110,000–$118,000 in cash each time. He told officers that he knew that he was supposed to declare any amount over $10,000 when he crossed the border, but that he had not intended to do so.

Almost two years later, Defendant was indicted on one count of attempted bulk-cash smuggling in violation of 31 U.S.C. § 5332(a)(1), (b), which carries a maximum sentence of five years' imprisonment. He pleaded guilty without the benefit of a plea agreement. The probation-office presentence report (PSR) calculated a base offense level of 22 and a total offense level of 17 under the guideline applicable to that statute, U.S.S.G. § 2S1.3(a)(2). With Defendant's criminal-history category of I, his guidelines sentencing range was 24 to 30 months. The PSR noted that in the prior five fiscal years 70 defendants with a primary guideline of § 2S1.3 had a criminal history of I, an offense level of 17, and had not received credit for substantial assistance. The average sentence was 13 months and the median was 12 months. The average and median were a few months longer if only those sentenced to prison were included. The PSR said nothing about the particulars of any of the offenses.

At sentencing, the district judge asked Defendant whether he had thought about the harm wrought by his crime and the cartel on communities in Mexico. He responded, "I clearly understand the harm. . . . [I]t brings a lot of violence and everything." R., Vol. IV at 28. The judge inquired, "[Y]ou say that you've been sitting in county [jail] this whole time thinking about your crimes, so tell me what you thought about that." *Id.* at 29. He responded, "Well, I mean at this point, it's too late to regret what I did. I mean, you

3

know, it's done already." *Id.* When asked why he engaged in his smuggling activity,

Defendant said, "I just wanted a better life." *Id.* at 30. The judge clarified, "For

yourself?" *Id.* He replied, "For myself, yes. I'm not going to lie." *Id.* The judge further

inquired, "While everybody in Mexico suffers under the cartels?" *Id.* Defendant replied,

"Well, unfortunately, yes." *Id.* The complete exchange between Defendant and the court

is in a footnote.[1]

---

[1] THE COURT: Mr. Guevara, what would you like to say before your sentence?

THE DEFENDANT: Well, I would just like to apologize for what I did. And my problem was two years ago. Yes, I picked up new charges in Texas. And with this time that I've been in custody, of course, I've been thinking a lot better than before.
And, yeah, I have a -- my mom is sick. She just went blind December 2023 -- no, my bad -- 2022. So I'm just trying to support her, you know. That's it, to be honest.

THE COURT: So while -- the time you've been sitting in custody, what have you thought about your crime?

THE DEFENDANT: Well, that's very stupid, to be honest.

THE COURT: Why is it stupid?

THE DEFENDANT: Because I'm young. I have a lot of things to do.

THE COURT: So it's stupid for what happens to you because of the crime?

THE DEFENDANT: Yeah. I mean, like -- no, like, what I did is very stupid because, like, I'm young right now, and, like, I have a lot of options to be doing out there, like good.

THE COURT: Yeah, it's true. It's stupid because of what happens to you. Have you thought about what your crime does to others?

THE DEFENDANT: Yeah, but --

THE COURT: Tell me about that.

THE DEFENDANT: Well, I guess, like, everybody has mistakes in life, but at that moment, I didn't thought [sic] of it.

THE COURT: You didn't think about giving the Mexican cartel $2,750,000?

THE DEFENDANT: How much?

THE COURT: $2,750,000.

THE DEFENDANT: I don't think that's -- well, I didn't thought [sic] of it in the moment. I was 19.

THE COURT: Have you thought while you've been in custody about what the cartel does with that money?

THE DEFENDANT: Well, I definitely know what they do with it, but --

THE COURT: So why are you giving it to them?

THE DEFENDANT: Well, it was just an offer that they gave me, like a job. Of course, not a job, but it was a good offer at the moment. It was COVID time. I was -- I had no money, to be honest. I didn't even have a car. I had -- I got laid off of work and everything, so -- I had to drop out of school like very young to support my family. And at that moment, that offer looked really good.

THE COURT: Okay. But did you think about the harm that your crime was causing to Mexico?

THE DEFENDANT: Yes.

THE COURT: Okay. Tell me about that.

THE DEFENDANT: I clearly understand the harm, but -- yeah.

THE COURT: Okay. Tell me about what you thought about that.

THE DEFENDANT: I don't know. I can't tell you what -- I can't tell you. I haven't -- I don't know.

THE COURT: You don't know what you think about the harm that your crime causes to Mexico?

THE DEFENDANT: Well, I know, like, it brings a lot of violence and everything, but, I mean --

THE COURT: You're from the border, right? You're from Del Rio, right?

THE DEFENDANT: Yes, I was born in Del Rio.

THE COURT: So you're familiar with what the cartels are doing in Mexico, right?

THE DEFENDANT: Yes.

THE COURT: And you -- when you give them $2,750,000, you know what they're doing with that money, right?

THE DEFENDANT: Yes. I mean, it's --

THE COURT: Well, tell me what you think about -- you've been sitting -- you say that you've been sitting in county this whole time thinking about your crimes, so tell me what you thought about that.

THE DEFENDANT: Well, I mean, at this point, it's too late to regret what I did. I mean, you know, it's done already.

THE COURT: Okay. Is that what you thought -- when you think about the crimes, you thought, "Well, it's done already. There's nothing I can do about it"?

5

THE DEFENDANT: Well, I mean, it was not in my hands either.

THE COURT: It was what?

THE DEFENDANT: It was like -- like I couldn't do anything, like, to avoid something they were going to do.

THE COURT: Say that again.

THE DEFENDANT: Like I couldn't avoid anything they were going to do. Like --

THE COURT: What do you mean?

THE DEFENDANT: Like, I mean -- yeah, like I definitely didn't thought [sic] of that. I mean, I was just like thinking -- I was just trying to live my life.

THE COURT: Yeah, but you were trying to live your life by giving very dangerous people very large amounts of money, so I'm concerned about that. I mean, this is a very large cash-smuggling case. And you did it -- I mean, you have pending state cases, right? So you'd already been in trouble, and you still did this. Why?

THE DEFENDANT: I just wanted a better life.

THE COURT: For yourself?

THE DEFENDANT: For myself, yes. I'm not going to lie.

THE COURT: While everybody in Mexico suffers under the cartels?

THE DEFENDANT: Well, unfortunately, yes.

THE COURT: All right. Mr. Guevara, is there anything else you'd like to say before I sentence you in this case?

THE DEFENDANT: No. I mean, I know you're going to make the good decision.

THE COURT: Anything else from the Government on this case?

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Anything else from you, Mr. Hossain?

MR. HOSSAIN: I guess I would only add that Mr. Guevara has obviously never been in a situation where he had to explain himself in front of a judge, a federal judge. And he's probably not the best -- most well-spoken young man. But I think he's had time -- he has had time to reflect on how he can become a better person from this, so --

THE COURT: Mr. Guevara, how have you reflected on becoming a better person?

THE DEFENDANT: Well, I have a CDL, so I've been thinking -- just go out and like support my mom. Like that's my main priority right now. I don't have kids. I don't have a wife. I don't have anything. So, like, the only thing left I have, like, of value is my mom. So I just want to support her, to be honest, and start thinking of creating a family, just becoming better, I mean --

6

The district court imposed a sentence of five years' imprisonment. The court explained as follows: It began by saying that it had considered Defendant's "arguments regarding his primary custody being in Texas, that these crimes occurred during the pandemic, his sentencing memo argument that the average sentence in a case like this is 12 months, that [Defendant] is young, that he will still have to face his pending cases in Texas, that his mother is ill, that he is young, that [Defendant] has thought about what he's done while he's been in custody and all the other arguments from [Defendant]." *Id.* at 32.

The court then said that it was considering all the factors set forth in 18 U.S.C. § 3553(a) "in imposing a sentence that's sufficient but not greater than necessary to comply with the purposes set forth in sentencing, including the nature and circumstances of the offense." *Id.* at 32–33. It expressed great "concern[] about the nature and circumstances of the offense in this case where the defendant smuggled well over $2 million of cash back to organized crime in Mexico," pointing out that "[i]t's a very large amount of money, and he knows, as he said today, what organized crime in Mexico is doing with the money." *Id.* at 33. And the court added that it appeared that Defendant was out on bond on two pending cases in Texas when he was arrested in this matter, "so I find the nature and circumstances of the offense to be extremely egregious." *Id.*

---

THE COURT: Okay. How have you thought you were going to become a better person?

THE DEFENDANT: Well, I mean, I guess, like, get a normal job like everybody does and stop doing things I'm not supposed to.

R., Vol IV at 26–32.

The court acknowledged that Defendant was young and had no criminal history, but it did not "find that that sufficiently mitigates against the other 3553(a) factors." *Id.* It explained that it was "considering the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment," and that an upward variance was needed "to reflect the very serious nature of this offense, promote respect for the law and to provide just punishment in this case." *Id.* It continued that it was considering an upward variance "to afford adequate deterrence to criminal conduct. [Defendant] didn't take all of this money to Mexico at once. He took large amounts of cash to Mexico repeatedly. The estimation was 25 to 30 times." *Id.* at 34. The court summarized that it was considering that "additional time is needed to deter [Defendant's] criminal conduct," "the need to protect the public from further crimes of [Defendant]," and the need for training and treatment, although it thought that treatment would be "best given on supervised release after any treatment that could be given in the Bureau of Prisons." *Id.*

The court recognized that the guideline sentencing range was 24 to 30 months but said that any presumption in favor of a guideline sentence "is overcome by the specific facts in this case." *Id.* It also said that it was "considering the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct[]," adding that the "defense hasn't made any showing that there's an unwarranted sentencing disparity among defendants with similar records who were found guilty of similar conduct," but that if there was some such disparity, "it is warranted by the particular facts in this case." *Id.* at 34–35. It then reiterated that Defendant had

8

participated in smuggling bulk U.S. currency into Mexico on at least 25 occasions involving at least $2,750,000.

After setting forth the particulars of the sentence, the court asked defense counsel if Defendant had "any objections to the adequacy of the explanation for any portion of the sentencing," and received the response, "No, not at this time." *Id.* at 37.

### III.

I would think that a great many people (many of them reasonable people) would consider it reasonable to impose a five-year sentence on someone who knowingly, and motivated solely by the desire for a "better life" for himself, provided frequent and substantial assistance over a period of six months to a very dangerous, violent multinational drug cartel but feels no remorse because his crimes are in the past and "it's done already." The district court's reasons for its decision are obvious. Defense counsel at sentencing saw no need for further explanation, and neither do I.

To set aside Defendant's sentence, the majority opinion relies on sentencing data for a few persons with a similar guidelines calculation, without identifying a single defendant who committed a comparable offense. I have serious concerns about this methodology.

To begin with, I think the methodology raises serious constitutional questions. At least as applied in the majority opinion, it effectively "requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range," *Gall v. United States*, 552 U.S. 38, 47 (2007), unless some minimum percentage of defendants with the same guideline range under the same guideline have received comparable sentences.  I find it

9

hard to distinguish such a mechanical process from the creation of a presumption of unreasonableness, which "would not be consistent with [*United States v. Booker*, 543 U.S. 220 (2005)]." *Gall*, 550 U.S. at 47 (rejecting "the use of a rigid mathematical formula that uses the percentage of a departure [variance] as the standard for determining the strength of the justifications required for a specific sentence").

Putting that concern aside, I cannot agree that the majority's methodology is adequate to the task of determining whether a sentence creates "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 28 U.S.C. § 3553(a)(6). The majority focuses on defendants who have been sentenced under a particular guideline, U.S.S.G. § 2S1.3. But the statistics that it uses do not disclose important information about the nature or circumstances of the offense. Section 2S1.3 covers a wide range of conduct beyond bulk-cash smuggling, such as structuring financial transactions to evade reporting requirements or operating an unlicensed money-transmitting business. *See* U.S.S.G § 2S1.3 and *id.* Commentary: Statutory Provisions. And even among bulk-cash smugglers, how many of the "comparable" defendants were knowingly assisting a violent international drug cartel in more than 25 operations over a six-month period? Perhaps all were, but neither Defendant nor the majority opinion has identified a single sentence of a defendant who engaged in similar conduct. *See United States v. Cortez*, 139 F.4th 1146, 1156 (10th Cir. 2025) (rejecting substantive-reasonableness challenge based on JSIN data because "Defendant fails to show how he is similarly situated with those of the national average"). There may be other guidelines that encompass only crimes that are sufficiently

10

closely related that the specific offense characteristics account for almost all the variation in covered offenses. *See id.* at 157–158 (McHugh, J., concurring). But § 2S1.3 is not one of them. And factors that are very important in sentencing—such as motive, remorse, and dangerousness—may well not be captured by the guidelines.

At the least, the proper comparison would be with those who have been found guilty of factually similar offenses, however they are charged and whatever guidelines were used to calculate their offense levels. *See* 18 U.S.C. § 3553(a)(6) (speaking of "disparities among defendants with similar records who have been found guilty *of similar conduct*" (emphasis added)). The majority opinion's focus on only conduct prosecuted under one of the statutes whose offense levels are calculated under § 2S1.3 is doubly inconsistent with the statute because it considers conduct that may be quite different from that of Defendant and it ignores conduct that is extremely similar.

For example, although Defendant was indicted on only one count of bulk-cash smuggling under 31 U.S.C. § 5332(a)(1), he could have been charged with joining a conspiracy to smuggle drugs into this country and smuggle cash out. Has anyone convicted of such a crime been sentenced to 60 months or more?

Even more closely in point is 18 U.S.C. § 1956(a)(2)(B)(ii), which authorizes a sentence of up to 20 years for anyone who "attempts to transport . . . funds from a place in the United States to . . . a place outside the United States . . . knowing that the . . . funds involved in the transportation . . . represent the proceeds of some form of unlawful activity and knowing that such transportation . . . is designed in whole or in part . . . to avoid a transaction reporting requirement under . . . Federal law." That language seems to

11

fit Defendant's conduct perfectly. I see no reason why Defendant could not have been charged under that statute since he admittedly knew that the funds came from unlawful drug sales and his hiding the money in his vehicle was likely designed in part to avoid the law requiring that he declare funds over $10,000 when crossing the border into Mexico (if there was a better way to get such large sums of money to Mexico without alerting authorities, it is not obvious to me). To be sure, the elements of the two offenses are not identical. But § 3553(a)(6) speaks only of "similar conduct." And the actions of Defendant for which he was convicted satisfied the elements of both offenses.

It appears that it is not uncommon for prosecutors in some jurisdictions to use this provision to charge conduct such as Defendant's. *See, e.g., United States v. Mier-Garces*, 967 F.3d 1003, 1006–1008 (10th Cir. 2020) (defendant pleaded guilty to participating in a money-laundering conspiracy, in violation of § 1956(a)(2)(B)(ii), (h), for his role in smuggling proceeds from drug sales in the U.S. to a Mexican drug trafficker); *United States v. Hurtado*, 38 F. App'x 661, 662–663 (2d Cir. 2002) (defendant was convicted of "international transportation of the proceeds of unlawful activity with the intent to avoid federal currency reporting requirements, in violation of § 1956(a)(2)(B)(ii)," after attempting to cross into Canada with $540,000 in cash concealed in luggage, employing "methods commonly used by Latin American drug cartels")); *United States v. Yuzary*, No. 97-1130, 1997 WL 234674, at *1 (2d Cir. May 8, 1997) (defendant was charged with attempting to transport funds he knew were the proceeds of unlawful activity out of the U.S. to avoid currency reporting requirement, in violation of § 1956(a)(2)(B)(ii), after airport customs officials found $480,000 in cash on his person and in his suitcase; but

12

charge was dismissed on double-jeopardy grounds); *Siu v. United States*, Nos. C09-1407-JCC, CR02-0192-JCC, 2009 WL 2032028 (W.D. Wash. July 7, 2009) (indictment Count 8 charges defendant with conspiracy to violate several laws, including § 1956(a)(2)(B)(ii), for conduct (described in sentencing memorandum) including smuggling $1.9 million in drug money from California to Canada in hidden vehicle compartments (indictment and sentencing memorandum available through Westlaw)); *Johal v. United States*, Nos. C08-1075-RSL-BAT, CR05-334-RSL, 2009 WL 210709, at *1–3 (W.D. Wash. Jan. 28, 2009) (defendant pleaded guilty to one count of violating § 1956(a)(2)(B)(ii) for transporting $200,000–$400,000 in drug money from Washington to Canada over a period of about two years).

Not only is the maximum sentence under 18 U.S.C. § 1956 four times greater than the maximum sentence under 31 U.S.C. § 5332, but the guidelines sentencing range is also more punitive. Rather than U.S.S.G. § 2S1.3, the applicable guideline is U.S.S.G. § 2S1.1. Under that guideline Defendant's base offense level would have been 24 (8 plus 16 (the number of additional offense levels from the table in § 2B1.1 corresponding to the value of the laundered funds)). *See* 2S1.1(a)(2). His offense level would have been increased by 6 levels under § 2S1.1(b)(1) because he "knew or believed" that "the laundered funds were the proceeds of . . . an offense involving the manufacture, importation, or distribution of a controlled substance." § 2S1.1(b)(1). It would have been further increased by 2 levels because he was convicted under § 1956. *See* 2S1.1(b)(2)(B). This offense level of 32 would have then been reduced by 7 levels per Defendant's PSR because he was a minor participant (about which I have a little to say later), accepted

13

responsibility, assisted authorities, and had no criminal-history points. This would result in an offense level of 25 and a guidelines range of 57–71 months, which Defendant's 60-month sentence was well within. And if the court determined that he was in the business of laundering funds, *see* U.S.S.G. 2S1.1(b)(2)(C), his final offense level would be increased by 2 to 27, resulting in a guidelines range of 70–87 months. *See United States v. Macias Martinez*, 797 F. App'x 974, 979 (6th Cir. 2020) (affirming application of business-of-laundering-funds enhancement where defendant admitted that he typically received $10,000–15,000 for transporting drug proceeds, agents had seized $400,000 from him in a vehicle stop years before, and defendant was a passenger during another vehicle stop in which officers seized $140,000); *Aguilar v. United States*, Nos. 1:16-36, B:13-830-1, 2017 WL 836249, at *1, 4, 5 (S.D. Tex. Feb. 1, 2017) (denying petitioner's claim that the enhancement was improperly applied where he admitted that (with at least four people working for him) he had been funneling drug proceeds from the U.S. to Mexico for the cartel for over two years, that he was often paid $100–$250 for each transaction, and that he helped to launder more than $1.8 million overall). I would think that identical conduct would be considered "similar" for purposes of § 3553(a)(6) even if it is charged differently in different jurisdictions. The sentences of those who engaged in similar conduct but whose guideline range was calculated under U.S.S.G. § 2S1.1 should therefore be considered in determining whether there is a disparity in sentences.

The majority opinion appears to criticize the above analysis as an improper calculation of Defendant's guideline range. It cites two opinions in support: *United States v. Wolfe*, 435 F.3d 1289, 1294, 1303–05 (10th Cir. 2006), and *United States v. Allen*, 488

14

F.3d 1244, 1251–52, 1259–62 (10th Cir. 2007). But *Wolfe* is inapposite because it considered only a pre-*Booker departure*, and departures are reviewed under much stricter standards than the substantive-reasonableness standard for variances. And *Allen* (a remarkable and highly unusual case in which the defendant pleaded guilty to a methamphetamine charge but the investigation uncovered his thinking about, and even preparing for, horrific crimes against children) reversed the sentence because "the district court essentially abandoned consideration of the advisory guidelines range and substituted a calculation based explicitly on unrelated conduct with which [the defendant] had not been charged or convicted." 488 F.3d at 1259. Here, in contrast, there is no challenge to the district court's calculation of the guideline sentencing range, and the crime being considered is the very conduct to which Defendant pleaded guilty.

More fundamentally, the question here is not whether the district court improperly considered another statutory offense; the district court never referred to § 1956. It is a rather different question: whether the sentence imposed by the court is comparable to sentences imposed on comparable defendants who commit comparable crimes. To answer this question, we need not, and should not, restrict ourselves to those charged under the same statute as the defendant. I see no reason why the fact that (as may have been the case here) the prosecutor undercharged the defendant should keep us from comparing his sentence to those who were "properly" charged. Of course, the undercharging may result in a shorter maximum sentence; but that is all the prosecutor can promise. Yet even though the Sentencing Guidelines cannot eliminate sentencing disparities that arise from prosecutorial charging decisions, the Guidelines Manual recognizes that one of the three

15

objectives of Congress in establishing the guideline system was to seek "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. Ch. 1, Pt. A, Subpt. 1, § 3 ("The Basic Approach (Policy Statement)") at 2. It would therefore seem odd to say that a sentence is unreasonable even though it would be well within the guidelines range if the government had simply charged the defendant under a different applicable statute for identical conduct.

A couple more points. First, to show that Defendant's sentence was an outlier, the majority opinion relies, at least in part, on the fact that Defendant is one of the handful of defendants in recent years to have been sentenced at the statutory maximum despite being granted a two-level minor-role reduction under U.S.S.G. § 3B1.2(b). But defendants who engaged in identical conduct may face quite different statutory maximums and the sentencing judges may differ in granting minor-role reductions. I have already noted that the maximum sentence for a single violation of 18 U.S.C. § 1956(a)(2)(B)(ii) is four times the maximum sentence for single violation of 31 U.S.C. § 5332. But there can also be great room for maneuver regarding how many violations are charged. The statutory maximum is computed by adding the maximums for each charge on which the defendant is *convicted*, not for each crime he actually *committed*. Thus, if Defendant had been charged with bulk-cash smuggling for the 25 or so occasions on which he committed the offense, his statutory maximum would have been 125 years, rather than five years. And defendants who engaged in conduct similar to Defendant's may have been denied minor-role reductions by other judges. Even if Defendant's reduction was consistent with the

16

practice of the probation office preparing his PSR, not every office sees things the same way. Apparently, some courts decline to give minor-role status to defendants whose conduct is similar to, and seems no more significant than, Defendant's. *See, e.g.*, *United States v. Tam*, 82 F.4th 536, 537–38, 541 (7th Cir. 2023) (affirming denial of mitigating-role reduction to defendant who participated in scheme to launder funds from drug sales by Mexican drug traffickers through bank accounts in China; defendant picked up cash from co-conspirators and delivered it to broker co-conspirators; he participated in the transfer of $1.4 million over the course of seven months, was involved in 10–20 pickups of money, knew the funds were the proceeds of drug sales, and received a small percentage of the laundered money as a commission, apparently earning about $7,500 in total); *United States v. Cartagena*, 856 F.3d 1193, 1195–97 (8th Cir. 2017) (affirming denial of minimal-role reduction to defendant who was paid $10,000 to carry over $250,000 in cash by bus from Pennsylvania to Los Angeles and then pick up 3,989 grams of heroin to carry by bus back to Pennsylvania); *United States v. Torres-Hernandez*, 843 F.3d 203, 204, 206, 209 (5th Cir. 2016) (affirming district court's denial of minor-role reduction to defendant whose participation in drug-trafficking offense was limited to carrying a bundle of marijuana on his back across the U.S.-Mexico border, because he was responsible for physically transporting the drugs into the U.S. and was paid for his participation); *United States v. Mero Munoz*, 805 F. App'x 797, 798–99, 801–02 (11th Cir. 2020) (affirming district court's denial of minor-role reduction to defendant, described by court as a courier, who participated in transportation of 477 kilograms of cocaine in fishing vessel captained by his uncle); *United States v. Guerrero-Deleon*, 713

17

F. App'x 163, 164–67 (4th Cir. 2017) (affirming denial of minor-role reduction to defendant who was paid $1000 to accompany codefendant who delivered two pounds of methamphetamine to confidential informant for $19,500; even assuming he was merely a courier, he had agreed to accompany seller on drug delivery and knew the scope of the conspiracy). This is not to say that it was necessarily incorrect to afford Defendant minor-participant status. But when addressing the reasonableness of the sentence—especially when a determination of unreasonableness is based on comparisons with presumably similar defendants—it strikes me as mistaken to exclude defendants not given minor-participant status even though they engaged in essentially the same sort of criminal conduct as Defendant.

Second point: The majority opinion bases its determination of substantive unreasonableness in part on what it terms procedural errors by the district court. Defendant, however, has not argued procedural unreasonableness on appeal; and I respectfully disagree with the majority opinion's treatment of these alleged errors.

There is only one respect in which a procedural error may properly impact our review for substantive reasonableness. When the sentencing court has failed to explain an out-of-line sentence that appears substantively unreasonable, we may remand to the district court to give it a chance to explain the sentence. *See, e.g., United States v. Crosby*, 119 F.4th 1239, 1251–53 (10th Cir. 2024). That is hardly the situation here. The district court emphatically explained its sentence. To abbreviate what the court said, Defendant repeatedly and over an extended period of time assisted an evil and dangerous criminal organization, solely to have an opulent life, and expresses no remorse. What more do we

18

want? Defense counsel certainly thought that the court's expansive explanation was sufficiently thorough. After imposing sentence the district court asked defense counsel, "[D]oes the defendant have any objections to the adequacy of the explanation for any portion of the sentencing?" R., Vol. IV at 37. Counsel responded, "No, not at this time." *Id.*

The majority opinion complains that the district court did not adequately explain the discrepancy between the sentence it imposed and the average sentences imposed on defendants based on a guideline calculation under USSG § 2S1.3 with the same criminal history and offense level as Defendant. (The only reference to the average sentences by defense counsel at sentencing was the sentence in his sentencing memorandum requesting a sentence of a year and a day, "which would be a sentence consistent with his lack of criminal history and consistent with the Judiciary Sentencing Information (JSIN) of similarly situated defendants," referencing the paragraph of the PSR that provided the averages. Aplt. App. at 17.) But, as already discussed at length, neither the PSR nor defense counsel (nor the majority opinion) has identified a single specific sentence of a comparable defendant who engaged in comparable conduct. And the Supreme Court has said, "Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall*, 552 U.S. at 54. There is no question that the district court here correctly calculated the guideline range and explicitly recognized that she was imposing a sentence well above that range. (I should add that the majority opinion distinguishes this case from this court's recent opinions in *Cortez*, 139 F.4th, 1146 and

19

*United States v. Valdez*, 128 F.4th 1314 (10th Cir. 2025), where we rejected substantive-reasonableness challenges, on the ground that in each of those cases "the district court adequately explained its reasons for the sentence imposed." Maj. Op. at 22. I invite readers to examine those opinions and see if they think the explanations were materially more thorough in those cases than here.)

The substantive-reasonableness analysis of the majority opinion also relies on what was truly an error by the district court. The court reversed the order in which Defendant committed his state and federal offenses. But this error is not the type of error we review under substantive-reasonableness doctrine. Basing a sentence on "clearly erroneous facts" is a "procedural error." *Gall*, 552 U.S. at 51. Procedural errors may affect the length of the sentence. If so, we can reverse and remand for resentencing. But that does not make the error a substantive-reasonableness error. Procedural errors, unlike substantive-reasonableness errors, must be preserved by raising them in district court. *See Molina-Martinez v. United States*, 578 U.S. 189, 193–94 (2016); *United States v. Luna-Acosta*, 715 F.3d 860, 865 (10th Cir. 2013) ("We have held that in order to preserve a sentencing issue for appellate review defendants must first raise in district court even those procedural objections that cannot be raised until after the district court has announced its sentence, such as the failure to adequately explain a sentencing decision."). An unpreserved procedural error, such as the sequencing error in this case, is to be reviewed only for plain error. *See United States v. Eddington*, 65 F.4th 1231, 1237 (10th Cir. 2023). To consider a factual error as part of the substantive-reasonableness analysis appears to be an innovation of the majority opinion in this case—an innovation

20

(apparently motivated by the desire to avoid applying plain-error review) that I think is misguided. It certainly confuses matters in this case.

Consider the specifics of the factual error relied on by the majority opinion. At the sentencing hearing the district court incorrectly stated that Defendant had been released on state bond when he was initially arrested on the bulk-cash charge. In reality, he was arrested in Texas on March 24 and May 8, 2023, on charges of transporting aliens who entered this country unlawfully. These state arrests occurred more than 18 months after his federal bulk-cash arrest and a few months before his indictment on the bulk-cash charge.

The district court thought it important that Defendant committed the federal offense while out on bail imposed in state court. The majority opinion therefore infers that the error must have influenced the sentence. This analysis is flawed. It ignores the potential impact of what the actual facts were. Defendant committed the state offenses, including smuggling aliens across the border, after being arrested on the federal charge. Is it worse that Defendant committed a federal smuggling offense after being charged for smuggling in state court or that he committed a state smuggling offense after being arrested for a federal smuggling offense? Apparently defense counsel did not think the difference was a big deal. Not only did he fail to point out the error to the sentencing judge, but he also failed to raise it in this court on appeal.

Ordinarily, we would treat these failures as a waiver. *See Eddington*, 65 F.4th at 1237 (failure to argue plain error on appeal waives the issue). But even if we did review for plain error, relief is not available unless Defendant can establish a reasonable

probability that the result (the sentence) would have been different in the absence of the error. *See United States v. Miller*, 978 F.3d 746, 765 (10th Cir. 2020). And he simply cannot do that on this record.

Finally, I should comment on the last sentence of the majority opinion's Discussion and the accompanying footnote. The opinion states that "importantly, we must guard against a defendant's sentence being perceived . . . as merely dependent on which judge he or she receives." Maj. Op. at 39. That would be a worthy objective. It was certainly a goal of the mandatory-guideline regime. But the Supreme Court held that the regime violated the Sixth Amendment. The fact is that different judges have very different views regarding sentencing, both in general and for particular types of offenses. Our review, however, is not for the purpose of establishing uniformity. We review the length of the sentence only for reasonableness. Footnote 16 suggests that the majority believes it significant and relevant that this court has recently considered substantive-reasonableness challenges to four sentences imposed by the judge who sentenced Defendant (although affirming the sentence in each case). But even if a judge consistently imposes harsher (or more lenient) sentences than some other judges, those sentences may well be reasonable. It is just possible that the sentences by the judge in this case reflect particular insights derived from a long and distinguished career as a criminal-defense attorney before taking the bench.

For the above reasons, I respectfully dissent.